UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAR 2 4 2017
```

Donovan G. Hewitt,

                    Plaintiff,

          —v—

Metro-North Commuter Railroad,

                    Defendant.

14-cv-8052 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

    In this action brought pursuant to the Federal Employers' Liability Act ("FELA"),

Defendant Metro-North Commuter Railroad ("Metro-North") has filed a *Daubert* motion and a

motion for partial summary judgment. The crux of Metro-North's motion is that much of the

testimony of Plaintiff's ergonomics expert, Dr. Andres, should be excluded as unreliable. As

explained below, the Court concludes that Dr. Andres' expert opinion is admissible. The Court

therefore denies Metro-North's motion to preclude Dr. Andres' testimony. Because Metro-

North's partial summary judgment motion and motion to exclude another expert's testimony are

premised on the exclusion of Dr. Andres' testimony, the Court also denies those two motions.

## I. Background

    Plaintiff Donovan Hewitt has brought this FELA action against his former employer,

Metro-North. Metro-North is a railroad company located in New York. Amend. Compl. ¶ 4

(Dkt No. 56); Plaintiff's Rule 56.1 Statement ¶ 2 (Dkt No. 91). Hewitt worked for Metro-North

from 2004 to 2014. Plaintiff's Rule 56.1 Statement ¶¶ 6, 88. From 2007 to 2014, Hewitt worked

as an "E-Cleaner" or "coach cleaner" at Metro-North's Highbridge facility. Plaintiff's Rule 56.1

Statement ¶¶ 6, 88. This job was allegedly very physically demanding, as it entailed cleaning

1

"every surface" in a railroad car, including the ceiling, walls, windows, floor, bathrooms, and seats. Plaintiff's Rule 56.1 Statement ¶ 23. This work required Hewitt to "use[] his arms constantly," including by reaching to clean high spaces, wringing out a mop, lifting heavy items, and removing or "popping" seat cushions. Plaintiff's Rule 56.1 Statement ¶¶ 7, 198, 214. According to Hewitt, the job was especially demanding because Metro-North frequently understaffed the coach cleaning division. Plaintiff's Rule 56.1 Statement ¶ 38; Def. Ex. B at 14-15 (Dkt No. 70-2).

Plaintiff alleges that, as a result of his work as a coach cleaner for Metro-North, he suffered certain injuries to his shoulders and arms. Plaintiff's Rule 56.1 Statement ¶¶ 1, 58. Multiple MRIs revealed that Hewitt suffered from, among other things, a torn rotator cuff, tendinosis in both his shoulder and elbow, shoulder impingement syndrome, and shoulder joint adhesions. Plaintiff's Rule 56.1 Statement ¶¶ 199-202, 209, 238. Over the span of approximately one year, Hewitt underwent three surgeries to attempt to fix these problems. Plaintiff's Rule 56.1 Statement ¶ 201, 204, 210. He also attended physical therapy. Plaintiff's Rule 56.1 Statement ¶ 211.

On October 6, 2014, Hewitt filed the present lawsuit. Dkt No. 1. His lawsuit alleges that the injuries to his shoulder and elbow were caused by Metro-North's failure to provide necessary tools, supervision, training, and manpower during his time as a coach cleaner. Amend. Compl. ¶ 16. The core of Hewitt's complaint is that Metro-North failed to "use reasonable care to provide [him] with a reasonably safe place in which to work" in violation of FELA. Amend. Compl. ¶¶ 2, 13, 16.

To support his claims, Hewitt retained the services of Dr. Robert Andres, a bioengineer and ergonomist. Plaintiff's Rule 56.1 Statement ¶¶ 118-19; Opp. at 6 (Dkt No. 90).

"Ergonomics is the science of fitting workplace conditions and job demands to the capabilities of the working population." *Ahmed v. Keystone Shipping Co.*, No. 10–14642, 2012 WL 5300094, at *5 (E.D. Mich. Oct. 25, 2012). This science focuses on ensuring a proper "fit" between a job and worker in order to increase productivity and avoid injuries. *Id.*; Def. Ex. B at 1.

Dr. Andres was retained for the purposes of assessing Hewitt's exposure to ergonomic risk factors while working as a cleaner for Metro-North. Def. Ex. B at 2. Ergonomic risk factors are "work-related factors that may pose a risk of musculoskeletal disorders." *Ahmed*, 2012 WL 5300094, at *5. "Common examples" include "repetitive, forceful, or prolonged exertions of the hands; frequent or heavy lifting, pushing, pulling, or carrying of heavy objects; and prolonged awkward postures." *Id.* Dr. Andres reviewed Hewitt's various job tasks, including lifting seat cushions, scrubbing overhead luggage racks, and cleaning various other parts of a Metro-North railroad car. Def. Ex. 13-19, 32-33. He concluded that these tasks exposed Hewitt to multiple ergonomic risk factors, including "awkward upper extremity postures" and repetitive hand gestures. *Id.* at 18. Dr. Andres also concluded that the amount of force that it required a cleaner such as Hewitt to remove a seat cushion in a Metro-North car exceeded recommended limits. *Id.* at 31-32.

In addition to analyzing Hewitt's exposure to ergonomic risk factors, Dr. Andres also reviewed Metro-North's approach to mitigating its employees' exposure to such factors. *Id.* at 2, 40-41. According to Dr. Andres, Metro-North failed to take a number of actions that could have limited Hewitt's exposure to ergonomic risk factors, including failing to perform an ergonomic screening or job analysis, failing to provide adequate tools to remove seat cushions, and failing to provide ergonomic training to employees. *Id.* at 40-41. Based on these observations, Dr. Andres concluded that it was his "opinion to a reasonable degree of ergonomic certainty that

3

[Metro-North] failed to provide Mr. Hewitt with a reasonable safety and health program that dealt with ergonomic issues that met standard industry work practices." *Id.* at 41. In reaching his conclusions, Dr. Andres relied upon various materials, including Hewitt's deposition transcripts, an interview with Hewitt, the deposition transcripts of other Metro-North employees, Hewitt's medical records, Metro-North's car cleaning manual, Metro-North's "Medical Guidelines for Coach Cleaner," and various scientific articles and literature. *Id.* at 3-5. Dr. Andres also conducted a site inspection of Metro-North's Highbridge facility on October 5, 2015. *Id.*; *see* Dkt No. 39. Metro-North hired its own ergonomics expert, Dennis Mitchell, who issued a report criticizing Dr. Andres' findings and methodology. Def. Ex. P (Dkt No. 70-17).

Hewitt also asked his treating orthopedic surgeon, Dr. Victor Sasson, to testify as an expert. Dr. Sasson started treating Hewitt in 2014 for his various shoulder and elbow injuries, and he was the doctor that performed the surgeries on Hewitt's arm. Plaintiff's Rule 56.1 Statement ¶¶ 7, 198-211. Dr. Sasson was asked to provide a summary of his evaluation and treatment of Hewitt and to opine on the cause of Hewitt's injuries. Plaintiff's Rule 56.1 Statement ¶ 197; Def. Ex. N at 1 (Dkt No. 70-15). Accordingly, Dr. Sasson issued a report that outlines Hewitt's medical history. Def. Ex. N at 1-3. Dr. Sasson also conducted a differential diagnosis — a process through which a physician determines what has caused a patient's symptoms by "consider[ing] all relevant potential causes of the symptoms and then eliminat[ing] alternative causes based on a physical examination, clinical tests, and a thorough case history," *see Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001) — in order to determine the cause of Hewitt's injuries. Dr. Sasson ultimately concluded that "Hewitt's job as a Metro North Railroad coach cleaner . . . was a significant contributing cause (not the sole cause) of the injuries/conditions and symptoms [Dr. Sasson] ha[d] treated him for and operated upon."

4

Def. Ex. N at 14.  To reach this conclusion, Dr. Sasson relied on, *inter alia*, Hewitt's medical

history, Metro-North's "Medical Guidelines for Coach Cleaner," Hewitt's deposition transcripts,

and Dr. Andres' preliminary report.  *Id.* at 3-4.

On March 30, 2016, Metro-North filed a motion for partial summary judgment.  Dkt No.

69.  The primary argument in this motion is that, with the exception of his opinions related to

seat removal, Dr. Andres' proposed expert testimony is inadmissible under *Daubert v. Merrell*

*Dow Pharm.*, *Inc.*, 509 U.S. 579 (1993).  Mot. at 11-22 (Dkt No. 72).  The company also seeks to

exclude Dr. Sasson's testimony on the ground that he relied upon Dr. Andres' purportedly

inadmissible opinion.  Mot. at 22-23.  Finally, Metro-North argues that, without the testimony of

Dr. Andres and Dr. Sasson, Hewitt does not have sufficient evidence to prove his claims, with

the exception of his allegation that his "injury was allegedly cause[d] by car seat removal."  Mot.

at 24.  The company therefore asks the Court to "dismiss[] all claims in plaintiff's Amended

Complaint other than those regarding alleged injuries sustained by plaintiff due to removal of

seat cushions on Metro-North trains."  Mot. at 25.

## II.  Legal Standards

### A.      Federal Employers' Liability Act

Hewitt brought suit pursuant to the Federal Employers' Liability Act ("FELA").  FELA is

"'a broad remedial statute' whose objective is 'to provide a federal remedy for railroad workers

who suffer personal injuries as a result of the negligence of their employer.'"  *Green v. Long*

*Island R.R. Co.*, 280 F.3d 224, 229 (2d Cir. 2002) (quoting *Atchison, Topeka & Santa Fe Ry. Co.*

*v. Buell*, 480 U.S. 557, 561-62 (1987)).  The statute states, in relevant part, that:

> Every common carrier by railroad . . . shall be liable in damages to any person suffering
> injury while he is employed by such carrier . . . for such injury or death resulting in whole
> or in part from the negligence of any of the officers, agents, or employees of such carrier,

or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

*Goodrich v. Long Island R.R. Co.*, 654 F.3d 190, 193 (2d Cir. 2011) (ellipses in original) (quoting 45 U.S.C. § 51). In short, "the statute creates liability for the 'negligence' of a common carrier by railroad resulting in 'injury or death' to a worker." *Id.* To succeed on a claim under FELA, a plaintiff "must prove the traditional common law elements of negligence." *Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 87 (2d Cir. 2006). However, the plaintiff's burden "is lighter under FELA than it would be at common law," *id.*, as this Circuit applies "a relaxed standard of negligence" in FELA cases, *Williams v. Long Island R.R. Co.*, 196 F.3d 402, 406 (2d Cir. 1999).

## B.   Summary Judgment

Federal Rule of Civil Procedure 56 authorizes a court to grant summary judgment to a moving party "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is "genuinely in dispute" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d.Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When deciding a motion for summary judgment, the Court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994). The moving party has the initial burden of demonstrating that no genuine issue of material fact exists. *Id.* If the moving party satisfies this burden, then "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact" to survive summary judgment. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citation omitted).

### C.    Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  That rule states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;
>>
>> (c) the testimony is the product of reliable principles and methods; and
>>
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  According to the Supreme Court's decision in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), district courts analyzing the admissibility of expert testimony under this rule have a "gatekeeper function."  *Restivo v. Hessemann*, 846 F.3d 547, 575 (2d Cir. 2017).  Specifically, a court has "an obligation to determine whether the expert's specialized knowledge will assist the trier of fact, *i.e.*, will be not only relevant, but reliable."  *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015).  The court should "focus on the principles and methodology employed by the expert" and exclude the expert's testimony if those principles and methodology are unreliable.  *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 662 (2d Cir. 2016) (citation omitted).

Although it establishes a "gatekeeper" function for expert testimony, the *Daubert* test is nonetheless "a liberal" and "permissive" standard of admissibility.  *Nimely v. City of New York*, 414 F.3d 381, 395-96 (2d Cir. 2005).  Under *Daubert*, expert testimony should be excluded only "if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison."

7

*Restivo*, 846 F.3d at 577 (quoting *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp.*, LLC,

571 F.3d 206, 214 (2d Cir. 2009)).  Absent this degree of unreliability, any "other contentions

that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Id.*

(quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).

### III.  Discussion

The overarching argument in Metro-North's motion is that Dr. Andres' expert

ergonomics testimony must be largely excluded under *Daubert*.  Mot. at 11-18.  If Dr. Andres'

testimony is inadmissible, Metro-North further argues that Dr. Sasson's expert testimony should

be precluded (because it relies upon Dr. Andres' inadmissible opinions) and that the company

should be granted summary judgment on every claim except those related to seat removal.  Mot.

at 22-25.

As explained below, the Court holds that Dr. Andres' proposed testimony survives

*Daubert* scrutiny.  Although district courts have been inconsistent regarding the admission of

ergonomics expert testimony, after reviewing the available precedent and Dr. Andres' reports,

the Court concludes that his opinions are based on sufficient facts and data and are sufficiently

reliable.  Because the Court finds Dr. Andres' expert testimony admissible, it denies Metro-

North's contingent arguments that the Court should exclude Dr. Sasson's testimony and award

partial summary judgment in the company's favor.

### A.      Dr. Andres' Expert Opinions Are Admissible Under *Daubert*

Metro-North argues that, with the exception of the proposed testimony related to seat

removal, Dr. Andres' testimony should be excluded under *Daubert*.  The company identifies four

purported deficiencies with Dr. Andres' expert opinions: (1) Dr. Andres did not observe any

employees performing Hewitt's job tasks (with the exception of seat removal), (2) Dr. Andres

relied upon Hewitt's "vague and self-serving statements and testimony" in forming his opinion, (3) Dr. Andres relied upon videotapes of employees working at railroads other than Metro-North, and (4) Dr. Andres' methodology lacks quantitative analysis. Mot. at 11-15. The railroad further argues that, because there is no generally accepted ergonomics mitigation standard, Dr. Andres should be precluded from testifying about what a reasonable railroad would have done to mitigate Hewitt's ergonomic risk factors and whether Metro-North complied with those recommendations. *Id.* at 15-18. Finally, Metro-North contends that Dr. Andres cannot testify as to "legal conclusions." *Id.* at 21. For the following reasons, the Court mostly rejects these arguments, but agrees with Metro-North's contention that Dr. Andres cannot testify as to "legal conclusions."

### 1.    District Courts' Inconsistent Approaches to Ergonomics Expert Testimony

The Second Circuit Court of Appeals has yet to opine on the admissibility of ergonomics expert testimony. However, many district courts, including a few courts within this Circuit, have grappled with this issue. Courts have taken arguably inconsistent approaches.

Several courts have excluded ergonomics expert testimony as unreliable. *See, e.g.*, *Myers v. Illinois Cent. R.R. Co.*, 679 F. Supp. 2d 903 (C.D. Ill. 2010); *Meyers v. Nat'l R.R. Passenger Corp.*, 648 F. Supp. 2d 1032 (N.D. Ill. 2009); *McCarty v. Canadian National/Illinois Cent. R.R.*, No. 3:06-cv-00177-HTW-LRA, 2008 WL 539214 (S.D. Miss. Feb. 26, 2008); *Pretter v. Metro North Commuter R.R. Co.*, 206 F. Supp. 2d 601 (S.D.N.Y. 2002) (Judge Rakoff); *Stasior v. Nat'l R.R. Passenger Corp.*, 19 F. Supp. 2d 835 (N.D. Ill. 1998); *Magdaleno v. Burlington N. R.R. Co.*, 5 F. Supp. 2d 899 (D. Colo. 1998). In contrast, many courts have found ergonomics expert opinions admissible under similar situations. *See, e.g.*, *Hardyman*, 243 F.3d 255; *Rowley v. Union Pacific Railroad Co.*, No. 11–CV–46, 2016 WL 6561296, at *1-*3 (E.D. Wis. Nov. 3,

2016); *Wright v. BNSF Ry. Co.*, No. 13-CV-24-JED-FHM, 2016 WL 1183135 (N.D. Ok. Mar.

28, 2016); *Marzoll v. Marine Harvest US, Inc.*, No. 08–261–B–S, 2009 WL 4456321 (D. Me.

Nov. 29, 2009) (report and recommendation), *adopted by* 2010 WL 53502 (D. Me. Jan. 7, 2010);

*Powers v. Union Pac. R.R. Co.*, No. 9:07-CV-212-TH, 2009 WL 734707 (E.D. Tex. Mar. 19,

2009); *Arsement v. Union Pac. R.R. Co.*, No. 9:07-CV-80-TH, 2009 WL 700606 (E.D. Tx. Mar.

17, 2009); *Bennett v. CSX Transp., Inc.*, No. 1:05-CV-839-JEC, 2006 WL 5249702 (N.D. Ga.

Sept. 19, 2006)); *Prater v. Consol. Rail Corp.*, 272 F. Supp. 2d 706 (N.D. Ohio 2003); *Ahmed*,

2012 WL 5300094.  The parties' briefing here focuses on only two opinions, both from this

Circuit, one by Judge Rakoff that excluded ergonomics expert testimony, *see Pretter*, 206 F.

Supp. 2d 601, and one by Judge Suddaby that partially admitted it, *see Campbell v. Consol. Rail

Corp.*, No. 1:05-CV-1501 (GTS/GJD), 2009 WL 36890 (N.D.N.Y. Jan. 6, 2009).  Mot. at 14-15,

18; Opp. at 18-20.

On an even more specific level, district courts are split as to the admissibility of Dr.

Andres' expert testimony.  Several courts have found his ergonomics opinions sufficiently

reliable to be admissible.  *Ahmed*, 2012 WL 5300094, at *5 ("Dr. Andres's expert testimony has

been received in other federal courts on the subject of ergonomic risk factors associated with the

workplace and remedial measures that could have addressed those factors.") (collecting cases);

*see, e.g.*, *Abernathy v. Union Pacific R.R. Co.*, No. 4:08CV04187–BRW, 2011 WL 1397439, at

*3-4 (E.D. Ark. Apr. 13, 2011); *Fitzgerald v. Buffalo & Pittsburgh R.R., Inc.*, No. 08–1534, 2011

WL 3163241, at *2-5 (W.D. Pa. Mar. 7, 2011) (report and recommendation), *adopted by* 2011

WL 3203729 (W.D. Pa. July 25, 2011); *Powers*, 2009 WL 734707, at *2-*5; *Huffman v. Union

Pac. R.R. Co.*, No. 9:07-CV-37-TH, 2009 WL 734709, *4 (E.D. Tex. Mar. 19, 2009); *Arsement*,

2009 WL 700606, at *4.  Other courts have excluded his testimony as unreliable.  *See, e.g.*,

*Khoury v. Philips Med. Sys.*, 614 F.3d 888 (8th Cir. 2010); *Bisson v. BNSF Ry. Co.*, No. 2:13-CV-0330-RHW, 2015 WL 12645757, at *4 (E.D. Wash. Feb. 13, 2015) (excluding some of Dr. Andres' testimony as unreliable); *Campbell*, 2009 WL 36890, at *4-5 (excluding some of Dr. Andres' testimony as unreliable); *Pretter*, 206 F. Supp. 2d at 605.

    With this legal background in mind, the Court analyzes the admissibility of Dr. Andres' testimony in this particular case.

### 2.    Dr. Andres is Qualified

    Although Metro-North does not contest the issue, *see* Mot. at 9, the Court briefly notes that Dr. Andres appears qualified to provide expert ergonomics testimony.  A witness may offer expert testimony if he is "is "qualified . . . by knowledge, skill, experience, training, or education." Fed. R. Evid. 702.  Dr. Andres has worked as an ergonomics researcher and professor for approximately forty years.  Def. Ex. B at 1.  He has repeatedly provided ergonomic job analyses to railroad companies upon request.  *Id.*  Additionally, Dr. Andres has conducted approximately two hundred site inspections of railroad workplaces.  *Id.* at 1-2.  Other district courts have found Dr. Andres qualified to offer expert ergonomics testimony.  *See, e.g., Ahmed*, 2012 WL 5300094, at *6 ("Dr. Andres appears well qualified to render an opinion on the subject of ergonomic risk factors associated with the workplace environment, as well as to suggest remedial measures that employers could have taken to address those risk factors."); *Powers*, 2009 WL 734707, at *2; *Campbell*, 2009 WL 36890, at *2.

### 3.    Dr. Andres' Expert Opinions are Based on Sufficient Facts and Data

    Expert testimony is admissible only if it is "based on sufficient facts or data." Fed. R. Evid 702(b).  Dr. Andres relied on the following materials when forming his expert opinions: (1) Hewitt's deposition testimony, (2) an interview with Hewitt, (3) descriptions of Hewitt's job

11

created by Metro-North, (4) an October 5, 2015 site inspection of Metro-North's Highbridge

Yard Car facility, (5) depositions from other Metro-North employees, (6) Hewitt's medical

records, (7) information Dr. Andres has accumulated during two hundred site inspections of

other railroad workplaces, (8) various scientific literature on ergonomics, and (9) litigation

materials provided to him by Plaintiff's counsel. Def. Ex. B at 3-5.

District courts have repeatedly found that the types of materials relied upon by Dr.

Andres in this case satisfy the "sufficient facts or data" requirement of Rule 702. For example,

in *Powers*, the district court concluded that Dr. Andres' opinions were based on sufficient facts

and data when he relied upon "litigation files, [plaintiff's] work history, medical diagnoses and

treatments," "job analysis summaries," "scientific literature and industry materials," and his "28

years of experience and practice in the field of ergonomics and over a decade of experience

studying the railroad industry." 2009 WL 734707, at *2. Similarly, in *Rowley*, the district court

admitted an ergonomic expert's testimony that was based upon an interview with the plaintiff,

the depositions of two of plaintiff's coworkers, safety videos from the defendant railroad, various

scientific literature, and the expert's own experience, education, and training. 2016 WL

6561296, at *1-*2. Various other district courts have ruled similarly. *See, e.g.*, *Wright*, 2016

WL 1183135, at *7 (admitting ergonomics expert testimony where proffered expert based his

conclusions on plaintiff's deposition testimony, an interview with plaintiff, "numerous published

studies and analyses," and evaluations by others who were employed by the defendant railway);

*Ahmed*, 2012 WL 5300094, at *6 (admitting Dr. Andres's expert testimony, which was based

upon photographs of the employee's work area and Dr. Andres's prior experience in "numerous

workplace settings"); *Prater*, 272 F. Supp. 2d at 714 (admitting ergonomics expert testimony

where proffered expert based his conclusions on an onsite analysis of the workplace and

"pertinent research"). The Court agrees with these courts that the materials relied upon by Dr. Andres when forming his opinions in this case satisfy the "sufficient facts or data" requirement of Rule 702.

Notwithstanding this precedent admitting ergonomics expert testimony under similar circumstances, Metro-North makes several arguments as to why Dr. Andres' opinions are not based on sufficient facts and data. These arguments also could be classified as challenging the reliability of Dr. Andres' proposed testimony.

First, Metro-North objects that Dr. Andres' opinions are inadmissible because he never personally observed any Metro-North employees performing the job tasks that allegedly led to Hewitt's injuries. Mot. at 11-15. Similarly, Metro-North criticizes Dr. Andres for relying upon videotapes of employees working at other railroad companies, rather than observing employees at Metro-North itself. Mot. at 12-13. The company also criticizes Dr. Andres for failing to observe Hewitt perform any of the allegedly dangerous job tasks. Mot. at 12.

For two reasons, the Court finds this alleged shortcoming insufficient to warrant exclusion of Dr. Andres' testimony. First, the evidence before the Court suggests that the science of ergonomics is sufficiently well-established so as to justify admitting expert testimony on the topic, even when the expert has not personally observed the allegedly unsafe job environment. As other district courts have recognized, it is well-established that "exposure to recognized ergonomic risk factors—including awkward postures, forceful exertions, repetitive motions, contact stresses, and cold temperatures—can cause" certain types of injuries and that these types of risk factors are especially prevalent in certain workplace settings, such as railroads. *Rowley*, 2016 WL 6561296, at *2; *see also Powers*, 2009 WL 734707, at *4 ("That ergonomic risk factors exist in a certain occupations and that known remedial measures alleviate

such risks has been widely described and accepted in the scientific community. That corrective actions can address ergonomic risk factors has been commonly accepted in the scientific community for several decades."); *Ahmed*, 2012 WL 5300094, at *6 (noting that the defendants did not "question the basic science of ergonomics"). Additionally, the Second Circuit has recognized that "in many cases," the requirements of Federal Rule of Evidence 704 can be met simply through the "personal knowledge and experience of the expert." *United States v. Litvak*, 808 F.3d 160, 181 n.25 (2d Cir. 2015) (citation omitted). Given these two considerations — the profusion of scientific literature on ergonomics and Dr. Andres' general familiarity with the science — the Court concludes that Dr. Andres could permissibly rely upon materials other than personal observations of Hewitt to form his opinions about the ergonomic risk factors present in Hewitt's particular workplace. The Court notes that other district courts have ruled similarly. *See, e.g.*, *Rowley*, 2016 WL 6561296, at *3 (rejecting argument that an ergonomics expert's opinions were "unreliable because he failed to . . . conduct an on-site investigation"); *Wright*, 2016 WL 1183135, at *6-7 (rejecting argument that ergonomics expert opinion should be excluded because the expert "did not personally assess plaintiff's work environment"); *Ahmed*, 2012 WL 5300094, at *6 (rejecting argument that Dr. Andres' testimony should be excluded because he had "only seen photographs of the stairway and area where Plaintiff fell and admittedly has never visited the ship"); *Smith v. BNSF Ry. Co.*, No. CIV–08–1203–D, 2011 WL 4054858, at *4 (W.D. Okla. Sept. 12, 2011) (rejecting argument that ergonomics expert's testimony should be excluded because the expert "never observed Plaintiff perform his job duties, nor did he observe any other railroad employee who held similar duties to those performed by Plaintiff"). *But see Myers*, 679 F. Supp. 2d at 915 (excluding expert testimony partly because the experts had "never been to any of Plaintiff's job sites nor observed Plaintiff's

work"); *Magdaleno*, 5 F. Supp. 2d at 905 (excluding expert testimony partly because the expert "did not make any detailed on-site analysis of the repair facility in operation").

Second, the Court rejects Metro-North's argument as inconsistent with the reality of FELA cases. Metro-North's arguments suggest that ergonomics expert testimony can be admitted only if the expert personally observed the plaintiff performing his job. But, as one district court noted, it may be "impossible for [an ergonomics expert] to observe plaintiff perform his job duties" because the plaintiff's injuries likely prevent him from continuing to work for the defendant railway. *Wright*, 2016 WL 1183135, at *7; *see also Rowley*, 2016 WL 6561296, at *3 (rejecting argument that it was necessary for an ergonomics expert to personally observe the plaintiff at work, especially when the plaintiff "ha[d] not worked for [the defendant] in years," meaning that "it would be impossible to directly observe him at work now"). The implication of Metro-North's arguments is that virtually all ergonomics expert testimony should be inadmissible, a result the Court rejects given the general acceptance of ergonomics in the scientific community and the numerous district courts that have admitted this evidence.

Next, Metro-North contends that Dr. Andres' testimony should be excluded because he partly based his opinions on Hewitt's own descriptions of his work, which Metro-North describes as "vague and self-serving." Mot. at 12. But, as mentioned above, it is frequently impossible for an ergonomics expert to observe the plaintiff in a FELA action doing his job, as that employee is presumably injured and has stopped working for the defendant railroad. *See Rowley*, 2016 WL 6561296, at *3; *Wright*, 2016 WL 1183135, at *7. A plaintiff's description of the type of work he did is one of the available alternative methods for an ergonomics expert to assess the ergonomic risk factors prevalent in the plaintiff's job. *See, e.g., Wright*, 2016 WL 1183135, at *7 ("[W]hile [the expert's] analysis is based in part upon what the plaintiff relayed

to him, whether through the questionnaire, or deposition or interview testimony, the mere fact that he relied on plaintiff's representations does not make his opinion inadmissible by default."); *Smith*, 2011 WL 4054858, at *4 ('[T]hat [an expert] relied on Plaintiff's description [of his daily responsibilities] does not render his opinion inadmissible."). Metro-North can of course cross-examine Dr. Andres about the fact that he relied upon Hewitt's own description of his work in forming his opinions and argue to the jury that this entitles his expert opinion to less weight. *See Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (alteration omitted) (quoting *Daubert*, 509 U.S. at 596)).

Overall, the Court concludes that Metro-North's criticisms of the type of information Dr. Andres relied upon when forming his expert opinions go to the weight, rather than the admissibility, of the proffered testimony. *See Restivo*, 846 F.3d at 577.

### 4.    Dr. Andres' Methods are Sufficiently Reliable

In addition to assessing whether an expert's opinion is based on sufficient facts or data, a district court engaging in the *Daubert* gatekeeper function must also ensure that the testimony is reliable. Fed. R. Evid. 702; *see also Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005). This inquiry is multi-faceted; the court must ensure that the expert employed reliable methodologies and that he reliably applied those methodologies to the facts of the particular case. *See* Fed. R. Evid. 702(c)-(d). A number of factors are relevant when conducting this analysis, including "the theory's testability, the extent to which it 'has been subjected to peer review and publication,' the extent to which a technique is subject to 'standards controlling the technique's operation,' the 'known or potential rate of error,' and the 'degree of acceptance'

within the 'relevant scientific community.'" *Romano*, 794 F.3d at 330 (quoting *Daubert*, 509

U.S. at 593-94). Nonetheless, this inquiry "is a 'flexible one,'" *Restivo*, 846 F.3d at 576 (quoting

*Daubert*, 509 U.S. at 594), and these factors "do *not* constitute a 'definitive checklist or test,'" *id.*

(quoting *Kumho Tire Co.*, 526 U.S. at 150).

After reviewing Dr. Andres' reports and Metro-North's expert's criticisms of these

reports, the Court concludes that Dr. Andres' opinions are sufficiently reliable to be admissible.

Def. Exs. B, P.  As mentioned previously, ergonomics is an accepted scientific field.  There is a

"wealth of research" and scientific literature supporting "the general theory that exposure to

recognized ergonomic risk factors" can cause certain injuries. *Rowley*, 2016 WL 6561296, at *2;

*see also Powers*, 2009 WL 734707, at *4 ("That ergonomic risk factors exist in a certain

occupations and that known remedial measures alleviate such risks has been widely described

and accepted in the scientific community.").  "[T]he subject of the physical effect of ergonomic

conditions on employees has been widely studied, analyzed, and discussed in published studies[,

and] . . . . the application of these conditions to railroad employees is also supported by reference

to published studies and analyses." *Smith*, 2011 WL 4054858, at *4; *see also Rowley*, 2016 WL

6561296, at *2; *Wright*, 2016 WL 1183135, at *8; *Powers*, 2009 WL 734707, at *4 (noting that

an ergonomics expert's methodologies had "been subject to peer review and publication dating

back to 1976" and that "the field of ergonomics is known to reach reliable results").  Dr. Andres'

report includes an overview of some of this literature. Def. Ex. B. at 5, 9-13. *Cf. Myers*, 679 F.

Supp. 2d at 915 (excluding expert testimony partly because the expert did "not cite any specific

scientific literature to support their causation opinions or any threshold levels for causation").

The acceptance of ergonomics in the scientific community suggests that Dr. Andres' opinions are

reliable.

Additionally, Dr. Andres' report employs multiple methodologies that are generally accepted in the field of ergonomics. For example, Dr. Andres utilized the "NIOSH lifting equation" when analyzing Hewitt's exposure to ergonomic risk factors, which has been accepted by district courts as reliable. Def. Ex. B at 31-32. *See Marzoll*, 2009 WL 4456321, at *7 ("The NIOSH Lifting Equation . . . is a tool generally used in the ergonomics field for evaluating lifting work tasks"); *Bennett*, 2006 WL 5249702, at *6 (noting that the defendants "concede[d] that the NIOSH lifting equation is a valid tool used within the field of biomechanics to evaluate the safety of a lift"). Dr. Andres also conducted a Rapid Upper Limb Assessment ("RULA"), another methodology considered reliable in the field of ergonomics. Def. Ex. B at 7, 32-35; *Fitzgerald*, 2011 WL 3163241, at *2; *Campbell*, 2009 WL 36889, at *8. Although Metro-North quibbles with Dr. Andres' application of these formulas to the facts of this case, "[a]ny limitations weaknesses of [Dr. Andres'] use of the[se] formula can be adequately addressed during both direct and cross-examination and grasped by a jury." *Marzoll*, 2009 WL 4456321, at *10; *see also Bennett*, 2006 WL 5249702, at *7 ("[T]he identification of issues associated with the alleged issues of a methodology that, in the abstract, is reliable should be accomplished on cross-examination-not by excluding a method as unreliable." (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003)).

Furthermore, the Court notes that, although courts are not unanimous on this point, many district courts have deemed Dr. Andres' expert ergonomics testimony reliable. *See, e.g.*, *Abernathy*, 2011 WL 1397439, at *3-*4; *Fitzgerald*, 2011 WL 3163241, at *2-*5; *Powers*, 2009 WL 734707, at *2-*4; *Huffman*, 2009 WL 734709, *4; *Arsement*, 2009 WL 700606, at *2-*4; *see generally Ahmed*, 2012 WL 5300094, at *5. *But see Pretter*, 206 F. Supp. 2d at 605; *Bisson*, 2015 WL 12645757, at *4 (excluding some, but not all, of Dr. Andres' testimony as unreliable).

18

Despite this authority, Metro-North contends that Dr. Andres' opinions are unreliable. In addition to raising the arguments discussed and rejected in the previous section, Metro-North contends that Dr. Andres' methodology lacked sufficient quantitative analysis to be reliable. According to Metro-North, Dr. Andres analyses were "entirely non-quantitative," not based on "measurements of equipment or of plaintiff," and lacked "any objectively measured evidenced [*sic*] of the frequency with which Metro North employees repeated their job functions or the levels of force they employed." Mot. at 12-15.

The Court finds Metro-North's argument unpersuasive for two reasons. First, Dr. Andres' methodology is not entirely devoid of quantitative analysis. Dr. Andres relied upon Hewitt's testimony and descriptions of his job to determine, chart, and tabulate the frequency with which Hewitt performed tasks associated with ergonomic risk factors. Def. Ex B at 14-16. He also calculated and sketched several awkward body postures that Hewitt experienced while working at Metro-North. Def. Ex. B at 18. Furthermore, he employed the NIOSH lifting equation discussed above. Def. Ex. B at 31-32. Additionally, Dr. Andres calculated "posture scores" for various tasks that Hewitt performed while working as a coach cleaner. Def. Ex. B at 32-34.

Second, even if Dr. Andres' methodologies were "non-quantitative" as Metro-North contends, the Court is not persuaded that this would render his opinion wholly inadmissible. Other courts have recognized that some aspects of ergonomics are unquantifiable. *Hardyman*, 243 F.3d at 265 (holding that district court erred in excluding expert testimony on the ground "there has been no scientific study conducted specifically on railroad brakemen"); *Marzoll*, 2009 WL 4456321, at *10 (admitting expert testimony even though the experts acknowledged that "quantifying the degree of risk of injury posed by a lifting task is a challenging endeavor, with a

variety of occupational and non-occupational factors potentially contributing to an injury"). The Court agrees with this authority.

In sum, although Metro-North identifies several purported deficiencies in Dr. Andres' methodology, the Court finds his opinions sufficiently grounded in the accepted scientific field of ergonomics as to be admissible. *Daubert* is a "liberal" and "permissive" standard of admissibility, *see Nimely*, 414 F.3d at 395-96, and the alleged deficiencies in Dr. Andres' opinion identified by Metro-North can be addressed through cross-examination at trial.

### 5. Dr. Andres May Testify About Metro-North's Lack of an Ergonomics Mitigation Program

In addition to analyzing Hewitt's job for ergonomic risk factors, Dr. Andres also reviewed Metro-North's approach to ergonomic risk factor mitigation. In his report, Dr. Andres identified a number of actions that a reasonable railroad could take to lessen the likelihood of employee injuries. According to Dr. Andres, those steps include "[p]erforming an ergonomic screening or job analysis," "[i]mplementing engineering (preferably) or administrative controls to decrease worker exposure to ergonomic risk factors," and "[a]dminister[ing] . . . ergonomic training." Ex. B. at 40-41. Dr. Andres also concluded that, based upon his review of the materials provided to him, Metro-North did not take these actions. Ex. B. at 41.

Metro-North contends that this proffered testimony should be excluded. Mot. at 15. According to Metro-North, there is no "generally accepted corporate practice" or standard benchmark ergonomics program, as organizations such as the Occupational Safety and Health Administration (OSHA), the United States General Accounting Office, and the American Association of Railroads, have failed to adopt an industry-wide standard. Mot. at 16-17. Because of this, Metro-North seeks preclusion of Dr. Andres' "general ergonomic opnion [*sic*]

regarding Metro-North's alleged lack of an ergonomic program and testimony concerning OSHA or OSHA rules and/or literature and General Accounting Office." Mot. at 25.

The Court finds this argument unpersuasive. As noted, it is widely accepted in the scientific community that ergonomic risk factors exist in certain occupations. *See Rowley*, 2016 WL 6561296, at *2; *Wright*, 2016 WL 1183135, at *8; *Powers*, 2009 WL 734707, at *4. More importantly for purposes of Metro-North's argument, it is also widely accepted that "known remedial measures" and "corrective actions" exist to "address [these] ergonomic risk factors." *Arsement*, 2009 WL 700606, at *4. Dr. Andres' report reiterates this point. *See* Ex. B at 9-13, 35. Although the fact that no organization such as OSHA has adopted a recommended or standardized ergonomics mitigation program may undermine Dr. Andres' conclusion that Metro-North failed to take reasonable steps to mitigate Hewitt's exposure to ergonomic risk factors, the absence of such a program does not, by itself, render his opinion inadmissible in light of the various scientific literature supporting Dr. Andres conclusion that a company can take certain remedial measures to mitigate ergonomic risk factors. *See Hardyman*, 243 F.3d at 265 (concluding that district court erred in excluding ergonomics expert testimony on the basis that there was "no scientific study conducted specifically on railroad brakemen"). Many district courts have allowed ergonomics expert testimony about what steps a company could have taken to mitigate the effects of ergonomic risk factors and whether a particular company had done so. *See, e.g.*, *Wright*, 2016 WL 1183135, at *6 (permitting ergonomics expert to testify that railway company "was aware of the ergonomic risks to which plaintiff was exposed and while there were means to reduce plaintiff's exposure to such risks, [the company] decided not to implement them"); *Powers*, 2009 WL 734707, at *3 (permitting Dr. Andres to testify about how the defendant railway's "ergonomic efforts compared to accepted best practices of reasonable

industrial employers"); *Arsement*, 2009 WL 700606, at *3 (same).  The Court is persuaded by this authority.  Again, Metro-North is free to cross-examine Dr. Andres about the lack of an industry-wide standard in an attempt to undermine his testimony.  But the Court will permit Dr. Andres to opine on what steps could have been taken to mitigate the effect of certain ergonomic risk factors and whether Metro-North complied with these recommendations.

### 6.    The Court Will Preclude Testimony Regarding "Legal Conclusions"

Although the Court concludes that Dr. Andres' testimony is generally admissible under *Daubert*, the Court will preclude one aspect of Dr. Andres' proposed testimony.  Dr. Andres may not testify as to any "legal conclusions," such as causation or negligence.

Under Federal Rule of Evidence 704(a), "[a]n opinion is not objectionable just because it embraces an ultimate issue."  The Second Circuit, however, has held that "expert testimony that expresses a legal conclusion" must nonetheless be excluded.  *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992); *see also Snyder v. Wells Fargo Bank, NA*, 594 F. App'x 710, 714 (2d Cir. 2014) (noting "that while expert 'may opine on an issue of fact within the jury's province,' he 'may not give testimony stating ultimate legal conclusions based on those facts'" (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)); *In re Thilman*, 557 B.R. 294, 302 (E.D.N.Y. 2016) ("Rule 704 was not intended to allow experts to offer opinions embodying legal conclusions." (citation omitted)); *Howard v. Town of Dewitt*, No. 5:12-cv-870, 2014 WL 12591690, at *3 (N.D.N.Y. Dec. 15, 2014).  The Second Circuit based this rule on the Advisory Committee Note to Rule 704, which states that expert "opinions which would merely tell the jury what result to reach" are impermissible.  *Hygh*, 961 F.2d at 363 (quoting Fed. R. Evid. 704 advisory committee's note); *see also United States v. Lumpkin*, 192 F.3d 280 (2d Cir. 1999) (noting that expert testimony is inadmissible "if it will usurp either the role of the trial judge in

22

instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it" (citations and quotation marks omitted)).

This principle requires the exclusion of some of Dr. Andres' proposed testimony. First, while Dr. Andres may testify that Hewitt was exposed to certain ergonomics risk factors at work and that those factors are associated with certain injuries, he cannot testify that those risk factors *caused* Hewitt's injuries. *See Prater*, 272 F. Supp. 2d at 714 ("Testimony that circumstances may give rise to a certain result differs from testimony that those circumstances gave rise to that result. That testimony is relevant and admissible, while leaving for the jury the ultimate question of causation in the particular case."); *Lovato v. Burlington N. and Santa Fe Ry. Co.*, No. CIV.A. 00–RB–2584CBS, 2002 WL 1424599, at *7, *9 (D. Colo. June 24, 2002) (permitting expert to testify that the plaintiff "in the course of his normal daily activities as a carman, was routinely and regularly exposed to ergonomic risk factors" but precluding expert from testifying "that the risk factors present in [the plaintiff's] work were sufficient to cause and did cause [the plaintiff's] injuries").

Second, Dr. Andres cannot testify that Metro-North was "negligent." Dr. Andres may permissibly opine on what steps a reasonable employer could have taken to mitigate ergonomic risk factors and whether Metro-North took those steps. *See, e.g.*, *Wright*, 2016 WL 1183135, at *6; *Powers*, 2009 WL 734707, at *3. He cannot, however, testify that Metro-North was "negligent" or, as he states in his report, that Metro-North "failed to provide Mr. Hewitt with a reasonably safe place to work." Def. Ex. B at 41; *see Hygh*, 961 F.2d at 364 ("We have held that an expert's testimony that a defendant was 'negligent' should not have been allowed."); *see also Strong v. E.I. DuPont de Nemours Co.*, 667 F.2d 682, 685-86 (8th Cir. 1981) (concluding that an expert could not testify "whether the lack of warnings rendered [certain] products unreasonably

dangerous"); *GlobalRock Networks, Inc. v. MCI Communications Servs., Inc.*, 943 F. Supp. 2d 320, 343 (N.D.N.Y. 2013) ("[A]n expert may not offer an opinion as to whether a parties' actions amount to gross negligence."); *Atlantic Specialty Ins. Co. v. Gold Coast Developments, Inc.*, No. 05-CV-4863 (JFB)(WDW), 2008 WL 974411, at *9 n.3 (E.D.N.Y. Apr. 8, 2008) (permitting "testimony regarding steps or procedures [were] available to a landlord [to avoid a sprinkler system from freezing]" on the ground that such testimony would "assist the trier of fact in determining the issue of negligence" but precluding testimony regarding the "ultimate legal conclusion as to whether the defendants were negligent").

Finally, Metro-North contends that Dr. Andres should be prohibited from defining or using the word "safety." Mot. at 21. According to Metro-North, use of the word "safety" is "a conclusory opinion" about the "ultimate issue in this case." *Id.* The Court finds this argument unpersuasive. Contrary to Metro-North's argument, Rule 704 expressly permits experts to opine on "ultimate issues." Fed. R. Evid. 704. And while an expert cannot testify as to legal conclusions, *see Hygh*, 961 F.2d at 363-64, the term "safety" is not a legal conclusion for purposes of this case. In order to succeed in this FELA action, Hewitt will need to show the basic elements of negligence. *See Tufariello*, 458 F.3d at 87 ("In FELA actions, the plaintiff must prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation."). The general term "safety" is not one of those elements.

### 7.    The Court Reserves on the Rule 403 Arguments

Metro-North makes a number of arguments based on Federal Rule of Evidence 403. For example, Metro-North contends that Dr. Andres' comments about how the railroad industry has "resisted ergonomics systematically" and has "suppresse[d] the publication of research results" should be excluded as "inflammatory, irrelevant, unscientific and unduly prejudicial." Mot. at

19. Similarly, they contend that Dr. Andres' statements about how Metro-North circumscribed his October 2015 site inspection should be excluded for the same reason. *Id.*

The Court reserves judgment on these issues. Under Rule 5 of this Court's Individual Practices in Civil Cases, it is the Court's regular practice to resolve evidentiary issues, such as Rule 403 arguments, only after dispositive motions have been resolved. Here, Metro-North does not appear to contend that, if the allegedly inflammatory evidence is excluded, Hewitt will have insufficient evidence to survive summary judgment. *See* Mot. at 18-22. Furthermore, Hewitt fails to respond to these Rule 403 arguments. Because Metro-North's Rule 403 arguments will not affect the Court's summary judgment decision, the Court will maintain its usual practice of resolving such evidentiary disputes at a later time. Metro-North may renew its Rule 403 arguments in a pretrial motion in limine.

### B. The Court Denies Metro-North's Motions to Exclude Dr. Sasson's Testimony and for Partial Summary Judgment

Finally, Metro-North contends that the Court should exclude Dr. Sasson's expert testimony and award summary judgment in its favor on every issue with the exception of seat removal. Mot. at 22-25. Both of these arguments are premised on Metro-North's contention that the Court should exclude Dr. Andres' testimony. *See id.* As outlined above, the Court has concluded that Dr. Andres' testimony is largely admissible. Because Metro-North's arguments for the preclusion of Dr. Sasson's testimony and for partial summary judgment are based entirely on the company's view that Dr. Andres' expert testimony should be mostly excluded, and because the Court has rejected this argument, the Court also denies Metro-North's motion to preclude Dr. Sasson's testimony and for partial summary judgment.

## IV. Conclusion

The Court will allow Dr. Andres' proposed expert testimony, except as to any "legal conclusions" he purports to offer.  The Court therefore denies Metro-North's motion to preclude Dr. Andres' testimony, to preclude Dr. Sasson's testimony, and for partial summary judgment. This resolves Docket Number 69.

The Court hereby orders the parties to meet and confer to engage in settlement discussions and to discuss a joint proposed schedule for the case.  The parties shall submit a joint letter, no later than April 14, 2017, that suggests a deadline for the submission of a joint pre-trial report and the other pretrial materials detailed in Rule 5 of the undersigned's Individual Practices in Civil Cases and proposes potential trial dates.

SO ORDERED.

Dated: _____March 24_____, 2017
New York, New York

_____
ALISON J. NATHAN
United States District Judge

26